IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SEAN PECK | : |
|       Plaintiff, | : |
| | : |
| v. | : |
| | : Civ. No. 23-3213 |
| LT. MEGAN BOLOGNONE, et al., | : |
| | : |
|       Defendants. | : |
| | : |

## ORDER

Plaintiff Sean Peck, who is represented by counsel, brings First Amendment Retaliation and Pennsylvania Whistleblower Act claims against Philadelphia Police Lieutenant Megan Bolognone and Deputy Commissioner Krista Dahl-Campbell. 43 Pa. Cons. Stat. § 1421, et seq; (Doc. No. 1.) Defendants move for summary judgment, which I will grant.

I.    BACKGROUND

A. Factual Background

I have construed the facts most favorably to Peck.

On November 1, 2022, Philadelphia Police Officer Sean Peck was promoted to Sergeant, placed on probationary status, and assigned to the Police Detention Unit. (SUMF ¶¶ 32, 37.) By May 2023, he resigned from the PPD. (Id. ¶ 434.) According to Peck, he was a "newly minted sergeant [and] a military veteran," who had a promising career until "his superior, Lt. Bolognone, retaliated against him for resisting [the] apparently common practice at the PDU of getting paid for hours that staff did not actually work." (Doc. No. 33 at 3-4.)

While serving in the PDU, Peck supervised Corporals Victor Cason and Marlo Holmon, as well as a number of Police Correctional Officers, and was responsible for "administrative duties," such as "mak[ing] the assignment sheets . . . the Daily Attendance Reports . . . [the] sending and

1

receiving sheets . . . [ensuring] overtime is hired . . . that [staff] are there . . . [and that staff] are doing their assignments." (SUMF ¶¶ 37-40, 59.) Peck reported to Bolognone, who reported to Captain Campione, who was supervised by Inspector Root, who was supervised by Chief Inspector Cochrane, who reported to Deputy Commissioner Dahl-Campbell. (Id. ¶ 368.)

On November 24, 2022, Peck saw PCOs "split [their] shifts," meaning "half the personnel worked for half the shift and the other personnel worked the second half of the shift." (Id. ¶ 86.) This is the only time Peck witnessed shift splitting at the PDU, and he did not report it in writing. (Id. ¶¶ 88-89.)

According to Peck, at some point, he and Bolognone had a series of "off the record" conversations during which she told him "I know I said you [] could run the squads your way as a sergeant, but I don't want any changes." (SUMF ¶ 104; Dep. of Peck I at 201-202.) When Peck asked her to be specific, Bolognone responded "I'm not talking about slide time." (SUMF ¶ 106; Dep. of Peck I at 200: 1-12.) Peck "read between the lines" and, offering contradictory assessments, "interpreted" this as Bolognone "not wanting to incriminate herself in case [he was] wearing a wire," or as telling him to allow overtime fraud. (SUMF ¶ 110; see also Dep. of Peck I at 202: 2-7.)

In December 2022, an EEOC investigation was initiated against Peck for alleged racist comments. (SUMF ¶¶ 136-137.) As a result, Peck was later charged with "conduct unbecoming." (Id. ¶ 149.)

On January 2, 2023, Peck sent Bolognone a request to be detailed or reassigned from the PDU after Bolognone told him that he was not a good fit for the Unit. (Id. ¶¶ 151-152.) There is no evidence that they then discussed time theft. (See id. ¶¶ 153-162.)

On January 4, 2023, Bolognone sent a "request for discipline" to Capt. Campione because

Peck had undermined a PCO during a dispute with a prisoner and disobeyed Bolognone. (Id. ¶¶ 165-170.)

On January 17, 2023, Bolognone completed Peck's Two-Month Probationary Evaluation Report. (Id. ¶ 185.) Peck received an overall rating of "satisfactory," but was admonished for: (1) not showing a "full interest in learning his job responsibilities"; (2) focusing "on other duties that are not his responsibility"; and (3) "undermin[ing] other staff." (Id. ¶¶ 185-187.) Peck told Capt. Campione that he felt Bolognone, through the Report, was "gaslighting [him], because [he] didn't approve overtime fraud." (Id. ¶ 201.) Campione felt that there was "no substantiation behind" these accusations. (Id. ¶ 203.)

On February 1, 2023, Peck emailed Cpls. Cason and Holmon a new "Standard Operating Procedure." (Id. ¶ 243.) Peck told them he was "ordered to spend more time in the office and less time in the cell block," and arranged for the Cpls. to "notify [him] via email if [they] observe[d] anyone absent from the unit in a manner inconsistent with their Daily Attendance Report entry." (Id. ¶¶ 244-46.) Neither Cason nor Holmon ever told Peck a PCO was absent from the Unit when he or she was supposed to be there. (Id. ¶ 247.)

On February 17, 2023, Peck and Cpl. Holmon got into an argument about a prisoner. (Id. ¶¶ 305-308.) Over the objection of Holmon, Peck took the unruly prisoner to get a medical evaluation. (Id. ¶¶ 306-308.)

On February 20, 2023 at 12:53 a.m. and 1:06 a.m., Peck sent emails to Bolognone describing two incidents that had occurred on February 19. (Id. ¶¶ 321-322.)

In the first email, Peck explained:

> . . . PCO Geffrard was upset I was on the shift because they would not be able to leave early. PCO Glenn told him he shouldn't be upset that I am doing things the right way. PCO Rivera began arguing with PCO Glenn. PCO Glenn stated PCO Rivera hid her property behind the trash for being

3

> kind to me when I wouldn't let them leave early.

(Doc. No. 29-39.) In the second, he wrote:

> On February 19th, 2023 at approximately 9:40 PM, I was sitting in the supervisors office when Police Correctional Officer (PCO) Rivera asked me when PCOs working overtime could leave. I said they would have to work the hours that they are being paid. She said something to the effect of 'Oh, its like that?' then walked out of the office and said 'They better not ask me for no overtime with him' in the presence of PCO Torres by the computer reserved for PARS entries and I believe PCO Naughty was in the intake room (check cameras for confirmation if needed). She then returned to the office and told me to apply 1 hour of vacation to her daily attendance report. I told her she could go to the Employee Assistance Program (EAP) if she was stressed. She declined.

(Doc. No. 29-44.) Peck's emails included no mention of "time theft," "wage theft," "overtime fraud," or "time fraud." (See Doc. Nos. 29-39, 29-44.)

Later on February 20th, Bolognone wrote up Cpl. Holmon, PCOs Glenn and Rivera, and two other PCOs in response to the February 17 incident involving the unruly prisoner. (SUMF ¶¶ 327-331.) Bolognone also issued two counseling statements to Peck for "working together with other supervisors" and lying. (Id. ¶¶ 333-334.)

The next day, Peck sent copies of his February 20 emails to Capt. Campione and Insp. Root. (Id. ¶ 339.) In addition, he reported a new allegation that he purportedly learned at 10:43 a.m. on February 20 (hours after he sent his emails to Bolognone and hours before he received his counseling statements). (Id. ¶¶ 321, 322, 333, 334, 339, 342.) According to Peck, PCO Wiggs told him that: (1) "Lieutenant Bolognone was upset [Peck] wouldn't allow time theft in the unit"; (2) Peck "would receive Performance Reports with unsatisfactory markings in a category or multiple categories . . . as long as [he] didn't condone time theft"; (3) supervisors in the PDU "who allow time theft in their squads will receive better Performance Reports than [Peck]"; (4) Bolognone and "others in the administrative office committed time theft"; (5) Bolognone "would

make false allegations against [Peck] as long as [he] did not allow time theft like the other supervisors"; and (6) Bolognone "and/or other supervisors would ensure that surveillance footage of the unit wouldn't be reviewed until after evidence of time theft has been deleted." (Id. ¶ 342.) Peck did not copy Bolognone on this email. (See Doc. No. 29-43.)

Significantly, Peck acknowledged that he did not report wage theft, time theft, or overtime fraud until *after* he learned of Wiggs's allegations. (See Dep. of Peck II at 299-300.) To the contrary, before Wiggs's call, Peck "felt that [his] squad was in compliance" and that he had successfully deterred wage theft and overtime fraud. (Id. at 299: 14- 24.) Moreover, other than the November 2022 shift splitting, Peck witnessed no time fraud or overtime fraud. (See id. at 111: ¶¶ 4-17.) It was only after Wiggs told him that "virtually all [squad] members except [Peck had] been committing time theft for years" that Peck felt he "had no choice" but to report the allegations. (Id. at 227: 13-22; 300: 1-7.)

Insp. Root told Capt. Campione to forward Peck's allegations to the Internal Affairs Bureau for investigation. (SUMF ¶ 344.) On February 22, 2023, Peck emailed Bolognone. (Id. ¶ 347.) Although Peck included no mention of time theft, he requested the preservation of "all video showing personnel entering and leaving the [PDU] . . . for investigation purposes of alleged misconduct." (Id.) After consulting with Chief Cochrane, Bolognone denied the request. (Id. ¶ 355.) The same day, Insp. Root asked Peck to provide "specific information such as dates, times, and personnel involved" in his time theft allegations. (Id. ¶ 364.) Peck could not provide specifics. Rather, he reiterated that Wiggs told him that "virtually all [PDU employees] except [Peck] [had] been committing time theft for years." (Id. ¶ 365.)

On February 23, 2023, Peck sent Dahl-Campbell an email titled "Wire Fraud Allegations." (Id. ¶ 367.) Before receiving that email, Dahl-Campbell was not aware of those allegations. (Id.

5

¶ 370.) She immediately forwarded Peck's email to Deputy Commissioner of Internal Affairs, Robin Wimberly. (Id. ¶ 371.)

On March 2, 2023, Peck sent Dahl-Campbell a memo titled "request for relief from hostile work environment/evidence preservation request." (Id. ¶ 374.) Dahl-Campbell forwarded the memo to DC Wimberly, telling her that "Peck was due for his five-month evaluation on April 1, and that she wanted to make sure Peck's evaluation was done properly by someone who was familiar with him." (Id. ¶¶ 377-379.) She also explained that she did not "want [Peck] to feel unsafe, but [she did not] want his evaluation to be interfered with in the event [Peck] is not suited for the promotion." (Doc. No. 29-51.)

On March 5, 2023, Peck was detailed out of the PDU. (SUMF ¶ 387.)

On April 1, 2023, Bolognone sent a 7-page memorandum to Dahl-Campbell, explaining that she did not recommend Peck for permanent status as a Sergeant. (Id. ¶ 388.) She explained, *inter alia*, that Peck: (1) lied to Bolognone; (2) was a poor communicator; (3) was demeaning to PDU personnel; (4) was overly friendly to prisoners; (5) undermined his staff; (6) had a sustained EEO complaint against him; and (7) failed to learn his role as a supervisor. (Doc. No. 29-54.) On April 3, 2023, Bolognone completed Peck's Five Month Probationary Report and rated him "unsatisfactory." (SUMF ¶¶ 389-390.) Bolognone noted that Peck: (1) was issued verbal and written counseling; (2) was "unable to supervise his subordinates [yet] require[d] constant supervision"; (3) responded defensively when issues were brought up; (4) did not respect the chain of command; and (5) was not a valuable leader in the Unit. (Id. ¶ 391.)

On April 26, 2023, Chief Cochrane and Insp. Root informed Peck that he had been rejected from his probationary status as a Sergeant. (Id. ¶¶ 397-399.) He was also told that he would be transferred to the 25th Police District and placed on the "last-out" shift. (Id. ¶ 402.) Peck never

6

reported to the 25th District, and instead resigned on April 30th, 2023. (Id. ¶¶ 405, 434.)

On May 5, 2023, Peck sent an Unredacted Incident Report to the Police EEO Unit and to "someone at the City" whose identity he purportedly did not remember. (Id. ¶¶ 435-436.) In the Report, he provided a timeline that he believes "demonstrates no adverse action was taken against [him] while serving as a Police Sergeant until after [he] reported the February 19th incident in which [he] was solicited to approve of overtime fraud/wire fraud and the offender insinuated that all other supervisors in the unit approve or acquiesce to overtime fraud/wire fraud." (Id. ¶ 437.)

### B. Procedural History

On August 21, 2023, Peck initiated this action, bringing First Amendment Retaliation (Count I) and Pennsylvania Whistleblower Law (Count II) claims against Bolognone, Dahl-Campbell, and Chief Inspector Michael Cochrane. (Doc. No. 1.) On April 18, 2024, the Parties stipulated to Cochrane's dismissal. (Doc. Nos. 31, 39.) Bolognone and Dahl-Campbell move for summary judgment on both claims.

## II. LEGAL STANDARDS

Summary judgment is warranted when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). An issue is material only if it could affect the result of the suit under governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Accordingly, summary judgment is appropriate when the movant shows that there is an absence of evidence to support the non-movant's case. Celotex, 477 U.S. at 325. The non-moving party "must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Grp., Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); Est. of Smith v. Marasco, 318 F.3d 497, 514 (3d Cir. 2003) (opposing

7

party "must present affirmative evidence—whether direct or circumstantial—to defeat summary judgment"); see also Liberty Lobby, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict.").

## III. FIRST AMENDMENT RETALIATION CLAIM

To make out this § 1983 claim, a public employee must show: "(1) his speech is protected by the First Amendment and (2) the speech was a substantial or motivating factor in the alleged retaliatory action, which, if both are proved, shifts the burden to the employer to prove that (3) the same action would have been taken even if the speech had not occurred." Bordamonte v. Lora, No 20-3415, 2021 WL 4473160, at *1 (3d Cir. Sept. 30, 2021) (quoting Munroe v. Cent. Bucks Sch. Dist., 805 F.3d 454, 466 (3d Cir. 2015)).

Defendants urge that Peck has failed to establish that: (1) his speech was protected by the First Amendment; (2) there is a causal nexus between his speech and the retaliatory action alleged; and (3) the same action would not have been taken had the speech not occurred. (Doc. No. 29-2.) Because Peck has not met his rebuttal burden as to prongs one and two, I will not address prong three.

### A. Protected Speech

Although Peck is represented by counsel, he is remarkably unclear as to what speech or activity he believes was protected. Indeed, in the section of his Response addressing this question, he states only that "Plaintiff's Reports of Solicitation of Criminal Activity and His Actions in Pursuit of Evidence of Said Allegations Are Protected by the First Amendment." (Doc. No. 33 at

6.)  He does not identify from the record what specific speech he means, or when it occurred.  (See id.)  In the Section of his Response dealing with causation, he indicates that his February 20, 2023 emails to Bolognone form the basis of his protected activity.  (See id. at 10.)  Construing Peck's counseled arguments liberally, I will assume that he believes these emails were protected speech.  I do not agree.

"[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a *citizen* addressing matters of public concern."  Garcetti v. Ceballos, 547 U.S. 410, 417 (2006) (emphasis added).  The proper inquiry for whether Peck's speech was made as a private citizen is a "practical one."  Id. at 424.  I examine:

> among other things: (1) whether the employee's speech relates to special knowledge or experience acquired through his job . . . ; (2) whether the employee raises complaints or concerns about issues relating to his job duties up the chain of command at his workplace . . .; (3) whether the speech fell within the employee's designated responsibilities . . .; and (4) whether the employee's speech is in furtherance of his designated duties, even if the speech at issue is not part of them.

Kimmett v. Corbett, 554 F. App'x 106, 111 (3d Cir. 2014) (internal quotations and citations omitted).

"Whether a person speaks as a citizen depends less on the subject matter—though that is relevant—than on the manner of speech, specifically whether the plaintiff is expected, pursuant to [his or her] job duties, to make the speech that is at issue."  Jerri v. Harran, 625 F. App'x 574, 580 (3d Cir. 2015) (internal quotations and citations omitted).

Peck urges that his emails "did not relate to any special knowledge or experience acquired through the job," that "no part of Plaintiff's duties and responsibilities included investigation of white-collar wire fraud," and that he "did not simply run a single complaint up the chain of command." (Doc. No. 33 at 7-9.)  The record shows just the opposite.

Peck's February 20, 2023 emails to Bolognone, describe two incidents: (1) a PCO was

9

upset Peck was on shift because the PCO would be unable to leave early; and (2) a PCO working overtime asked Peck when he could leave, to which Peck responded that he would need to work the hours he was being paid. (See Doc. Nos. 29-39, 29-44.) Peck thus documented attendance issues, which the Parties agree fell within Peck's responsibilities as a supervisor. (SUMF ¶ 47.)

Moreover, to the extent Peck believes that these emails reported the solicitation of overtime fraud, and thus somehow fell outside his job responsibilities, that argument is belied by his own testimony. Peck acknowledged that one of the initiatives he implemented as Sergeant was to "eliminate overtime fraud," and that it was "very important to [him] that . . . [his] officers and specifically corporals weren't indicted on . . . overtime fraud charges." (Dep. of Peck I at 156: 2-9.) Peck believed that he was responsible for creating "a more compliant place of work to protect the interest of . . . the City," and so ordered Cpls. Cason and Holmon to help prevent overtime fraud. (Dep. of Peck II at 105-106; see also Dep of Peck I at 152: 9-16 ("I wanted to make it clear that [Cpls. Holmon and Cason] were responsible for any overtime fraud.").) As Peck testified, he "can delegate authority, but not responsibility." (Dep. of Peck II at 145: 19-23.) Peck cannot acknowledge that it was his responsibility to stop overtime fraud and also urge that reporting such fraud to his superiors was not his responsibility. Indeed, it is undisputed that Peck reported these incidents to Bolognone, who is directly above him in his chain of command. (SUMF ¶ 368.) "[I]n making their voices heard up the chain of command, government employees speak pursuant to their duties as government employees." Taylor v. Pawlowski, 551 F. App'x 31, 32 (3d Cir. 2013) (internal quotation and citation omitted); see also Morris v. Phila. Housing Auth., 487 F. App'x 37, 39 (3d Cir. 2012) ("We have consistently held that complaints up the chain of command about issues related to an employee's workplace duties—for example, possible safety issues or misconduct by other employees—are within an employee's official duties.").

Accordingly, because Peck's "own understanding of his job responsibilities encompassed" documenting attendance issues and eliminating overtime fraud, and because these emails went through his chain of command, "his reports fall within a practical understanding of his official duties . . . [and] are, therefore, not private citizen speech entitled to First Amendment protection." Ankney v. Wakefield, No. 10-1290, 2012 WL 2339683, at *6 (W.D. Pa. June 19, 2012) (citing Gorum v. Sessoms, 561 F.3d, 179, 185 (3d Cir. 2009)).

In these circumstances, Peck's February 20 emails were not protected speech.

**B. Causal Connection**

Peck also has not shown that his speech was a substantial or motivating factor in the alleged retaliatory action.

To establish causation, the "plaintiff must first show that the defendant had knowledge of the protected activity to show that such activity was 'a substantial or motivating factor' in its disciplinary action." Hamilton v. Radnor Twp., 502 F. Supp. 3d 978, 987 (E.D. Pa. 2020) (quoting Ambrose v. Twp. Of Robinson, 303 F.3d 488, 493-94 (3d Cir. 2002)). Even with knowledge, the plaintiff must "prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007).

"Before assessing whether [Peck] can establish causation . . . [I] must examine the factual record to determine the earliest date on which a reasonable jury could conclude that" Defendants knew of his purported protected activity. Volek v. Redevelopment Auth. Of Cnty. Of Fayette, 24 F. Supp. 3d 473, 485 (W.D. Pa. 2014). It is Peck's burden to "produc[e] some evidence that the relevant decision makers knew, at the time the decision was made," about his allegations. Id. at

485-86. Peck "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue." Rink v. Northeastern Educ. Intermediate Unit 19, 717 F. App'x 126, 133-34 (3d Cir. 2017) (internal citations omitted).

### 1. Lt. Bolognone

Defendants urge that "Peck cannot demonstrate that any of the Defendants knew of his supposed protected activity before he was verbally counseled, counseled in writing, evaluated, and rejected from probation." (Doc. No. 29-2 at 14.) Peck counters that it was "obvious that . . . Bolognone and Dahl-Campbell new [sic] of" Peck's time theft allegations because of their off-the-record conversations and Peck's February 20, 2023 emails. (Doc. No. 33 at 11-12.)

Bolognone testified that she was unaware of Peck's time theft allegations because Peck did not report or discuss the issue with her. (Dep. of Bolognone at 18: ¶¶ 7-14.) In response, Peck attempts to impute to Bolognone knowledge of his time theft allegations by identifying "off the record conversations" between the two. (Doc. No. 33 at 10-11.) Peck acknowledged that he "**read between the lines**" and "**interpreted**" these conversations as her telling him to allow overtime fraud. (SUMF ¶ 110; Dep. of Peck I at 202: ¶¶ 2-18 (emphasis added).) Remarkably, at the same time, he felt that Bolognone avoided the overtime subject, "not wanting to incriminate herself in case [Peck was] wearing a wire." (SUMF ¶ 110.) Peck's "interpretation" is thus evidence of nothing. His "interpretation" is no more than a "suspicion," which does not create a genuine issue of material fact, especially where the suspicion contradicts itself. See Rink, 717 F. App'x at 133-34. He fails to identify anything else in the record that shows he made allegations of time theft, or that anyone in his chain of command knew of any such allegations before February 21, 2023. (See generally Doc. No. 33.)

Peck next contends that he "reported to Lt. Bolognone that he had been solicited to commit

or facilitate wage theft/wire fraud" in his February 20, 2023 emails. (Doc. No. 33 at 10.) These emails do not, however, mention "time theft," "wage theft," "solicitation," or "wire fraud." (Doc. Nos. 29-39, 29-44; SUMF ¶ 323.) Rather, he told Bolognone only that "PCO Geffrard was upset [Peck] was on the shift because [the PCOs] would not be able to leave early," and that PCO Rivera asked Peck when he could leave. (Doc. Nos. 29-39, 29-44; SUMF ¶ 319.) Moreover, Peck could not at that time have reported solicitation of time theft; Peck acknowledged that he had no evidence of time theft *before* he spoke to PCO Wiggs. Until he learned of Wiggs's allegations (which he received hours *after* he sent the February 20 emails), and other than one incident of shift-splitting in November 2022 (which Peck did not report in writing), Peck never witnessed time theft or overtime fraud. (See Dep. of Peck II at 111: ¶¶ 4-17.) Indeed, until after he sent these emails, he believed his squad was in compliance. (Id. at 299-300.)

Finally, to the extent that Peck argues that the temporal proximity between his February 20 emails and Bolognone's counseling statements creates an inference of knowledge, he is wrong. "[T]emporal proximity cannot be used to show that an employer was aware of the protected activity in the first place." Uhl v. Cnty. Of Allegheny, No. 06-01058, 2008 WL 2858412, at *7 (W.D. Pa. Jul. 22, 2008) (citing Ambrose, 303 F.3d at 494).

Peck points to no actual evidence that contradicts Bolognone's testimony that she was unaware of his allegations. "Without this evidence, [Peck] cannot survive summary judgment on his retaliation claim" against Bolognone. Weil v. White, 629 F. App'x 262, 266 (3d Cir. 2015).

### 2. DC Dahl-Campbell

In response to Defendants' contention that Dahl-Campbell did not know about his allegations, Peck identifies the February 23, 2023, email titled "Wire Fraud Allegations." (Doc. No. 33 at 12 (citing Doc. No. 29-50).) Peck has nonetheless failed to show an unusually suggestive

13

temporal proximity or a pattern of antagonism.

Peck first urges that he has met his temporal proximity burden by identifying the emails he sent on February 20, 2023, and the counseling statements he received from Bolognone later that day. (Id. at 10.) Putting aside that Dahl-Campbell was not copied on his February 20 emails and that there is no evidence that she influenced Bolognone's decision to write the counseling statements, it is undisputed that Dahl-Campbell did not know about Peck's belated February 20 allegations until February 23, 2023. (SUMF ¶¶ 367- 370.) This argument thus fails.

Peck next contends that he has established a "clear pattern of antagonism" between himself and Dahl-Campbell. (Doc. No. 33 at 11.) He urges that the pattern "started in November" of 2022 and "ran through and included the [January 2023] Two Month Probation Report, the fabricated written counseling statements issued on February 20th, 2023, [his] Five-Month Report, his false write up on March 3rd, 2023, and the Rejection from Probation." (Id.) I disagree, and apparently, so does Peck. (See Doc. No. 29-62 (On May 5, 2023, Peck reported that "no adverse action was taken against [him] while serving as a Police Sergeant until after [he] reported the February 19th incident[s]" in his February 20 emails to Bolognone.).)

Peck urges—again without evidentiary support—that Dahl-Campbell "used her authority and power to ensure" that Bolognone wrote the negative five-month probationary report. (Id. at 16-17.) Peck highlights that after he emailed his time theft allegations to Dahl-Campbell, she told "Captains Wimberly, Conway, and Vogt of Internal affairs [that] she wanted to make sure [Peck's] evaluation is done properly by someone who is familiar with him," and that she did not "want [Peck] to feel unsafe, but [] also [did not] want his evaluation to be interfered with in the event he is not suited for [] promotion." (Id. at 12; Doc. No. 29-51.) Peck contends that this shows that Dahl-Campbell "took and [sic] active role in facilitating the retaliatory acts in the form of a

demotion." (Doc. No. 33 at 17.) Peck's identification of disciplinary actions that occurred after his allegations of time theft, by someone other than Dahl-Campbell, does not create a genuine dispute as to whether Dahl-Campbell was involved in a pattern of antagonism. See Boyd v. Citizens Bank of Pennsylvania, Inc., No. 12-00332, 2014 WL 2154902 at *28 (W.D. Pa. May 22, 2014) (internal quotation and citations omitted) ("One act does not constitute a pattern of antagonism . . . In addition, the occurrence of disciplinary action following protected activity does not establish a pattern of antagonism.").

Moreover, Peck has failed to identify the type of "repeated interaction[]" between himself and Dahl-Campbell that is required to establish a pattern of antagonism. See Buck Foston's New Brunswick LLC v. Cahill, No. 11-03731, 2013 WL 5435289, at *16 (D. N.J. Sept. 27, 2013) (internal citations and quotations omitted) ("Pattern of antagonism causation requires repeated interactions of plaintiff and defendant."). Other than emailing Dahl-Campbell once, Peck has not identified any other interactions between the two.

Accordingly, because he has failed to identify evidence supporting temporal proximity or a pattern of antagonism, and because Peck has failed to show "from the evidence gleaned from the record as a whole [that] the trier of fact should infer causation," his First Amendment Retaliation claim fails. See DeFlaminis, 480 F.3d at 267 (internal quotations and citations omitted).

In sum, I will grant summary judgment for both Defendants on this claim.

IV. **PENNSYLVANIA WHISTLEBLOWER CLAIM**

"Recovery under the PWL requires evidence that plaintiffs: (1) reported an instance of wrongdoing or waste to an appropriate authority; and (2) there is a causal connection between the report and the alleged retaliation." Mollichella v. Bd. of Supervisors West Brandywine Twp., 18-4868, 2020 WL 1904593, at *6 (E.D. Pa. Apr. 16, 2020). Because Peck argues only that he

15

reported "wrongdoing," I will not analyze his claim under a "waste" theory.  (See Doc. No. 33 at 5.)

Peck urges that he has "successfully established a *prima facie* case" under the PWL because on February 20, 2023, hours after reporting to Bolognone that he had "been solicited to commit or facilitate wage theft/wire fraud," she issued two false counseling statements accusing him of "lying" and "undermining Cpl. Holmon."  (Id. at 5-6.)  I disagree.

**A. Wrongdoing**

Wrongdoing is defined as, *inter alia*, a violation "not of a merely technical or minimal nature of a Federal or State statute or regulation."  43 Pa. Stat. Ann. § 1422.  The PWL "specifically exempts complaints of misconduct that are not prefaced upon the violation of a particular law or regulation from its protections of complaints of wrongdoing."  Psota v. New Hanover Twp., No. 20-5004, 2021 WL 6136930, at *26 (E.D. Pa. Dec. 29, 2021) (internal citations omitted). Accordingly, Peck "must specify [in his reports] how [his] employer is guilty of waste and/or wrongdoing."  Gray v. Hafer, 651 A.2d 221, 225 (Pa. Commw. Ct. 1994), aff'd, 669 A.2d 335 (Pa. 1995).

As I have discussed, Peck's February 20, 2023 emails do not describe "wage theft," "time theft," or "wire fraud."  (SUMF ¶¶ 322-325; Doc. Nos. 29-39, 29-44.)  At most, they explain that two PCOs wanted to leave early, but did not.  (Doc. Nos. 29-43, 29-44.)

Peck's "reports" do not specify how Bolognone or anyone else at the PDU committed, condoned, or solicited time theft.  To the contrary, Peck acknowledged that at the time, he did not know enough to report time theft.  It is undisputed that Peck witnessed only one instance of shift splitting during his time at the PDU.  (SUMF ¶ 89.)  Once again, before February 20, he believed that his "squad was in compliance," and that he had adequately prevented or deterred wage theft

and wire fraud. (Dep. of Peck II at 299-300.) It was only after he sent his February 20 emails—after Wiggs told Peck that "virtually all [squad] members except [Peck had] been committing time theft for years"—that Peck felt he "had no choice" but to report the allegations. (Id. at 227: 13-22; 300: 1-7.)

Accordingly, because the "reports" upon which Peck bases his PWL claim include only "vague or subjectively wrong conduct," they cannot be considered to report "wrongdoing under the Whistleblower law." Sukenik v. Twp. Of Elizabeth, 131 A.3d 550, 555-56 (Pa. Commw. Ct. 2016); McAndrew v. Bucks Cnty. Bd. of Comm'rs, 183 F. Supp. 3d 713, 743 (E.D. Pa. 2016) (to make out a *prima facie* PWL claim, plaintiffs "must point to Defendants' violation of a specific statute, regulation, ordinance, or code of conduct or ethics."); Bennett v. Republic Servs., Inc., 179 F. Supp. 3d 451, 456 (E.D. Pa. 2016) (quoting Gray, 651 A.2d at 225) ("An employee who has been terminated based on a filed report and wants to base his or her complaint on their employer's violation under the Whistleblower Law must specify how their employer is guilty of waste and/or wrongdoing.").

**B. Causation**

Peck has also failed to show a causal connection between his report and any retaliatory conduct.

Peck argues that because he received "false written counseling statements" within 24 hours of sending his February 20 emails, subsequent additional counseling statements, a negative five-month review, and then a demotion, there is evidence from which a fact finder could make out a causal connection. (Doc. No. 33 at 5-6.) Under the PWL, however, "the mere fact that the [adverse action] occurred . . . within a given amount of time" after the report of wrongdoing "is insufficient to [survive summary judgment]." Evans v. Thomas Jefferson Univ., 81 A.3d 1062, 1070-71 (Pa.

17

Commw. Ct. 2013) (internal quotations and citations omitted). Rather, Peck must "show by concrete facts or surrounding circumstances that the report led to [some adverse action]." Gray, 651 A.2d at 225. "[V]ague and inconclusive circumstantial evidence is insufficient to . . . to show a causal connection." Evans, 81 A.3d at 1070 (internal quotations and citations omitted).

Peck "does not present sufficient evidence to establish a causal connection . . . [because he] does not allege that his supervisors threatened to fire him or to impose any other adverse consequences because of his report, nor does he establish any other 'concrete facts' to connect the report with" his rejection from probationary status and resignation. Bennett, 179 F. Supp. 3d at 456 (quoting Golaschevsky v. Com., Dept. of Environmental Protection, 720 A.2d 757, 759 (Pa. 1998)). Indeed, it is undisputed that Capt. Campione and Insp. Root forwarded Wiggs's allegations to IAB for further investigation. (SUMF ¶¶ 342-344.) Root then followed up with Peck, asking for more specific allegations of time theft to aid that investigation—which Peck could not provide. (Id. ¶¶ 359, 364, 365.) This same progression of events occurred with respect to Dahl-Campbell. (Id. ¶¶ 367-371.) Accordingly, Peck has not shown causation. See Angelini v. U.S. Facilities, Inc., No. 17-4133, 2020 WL 4015205, at *8 (E.D. Pa. Jul. 16, 2020) (no causal connection where employer did not "threaten Plaintiff with repercussions for his reports . . . discourage Plaintiff from making those or any other reports" and where, to the contrary, "Plaintiff's supervisors responded to his reports with support, even encouraging others' compliance with Plaintiff's suggestions.").

In these circumstances, Peck has failed to make out his PWL claims against both Bolognone and Dahl-Campbell.

## V. CONCLUSION

The summary judgment record consists of some 1400 pages of depositions, emails, text messages, and documents. (See Doc. Nos. 29, 34.) Significantly, despite his obligation to answer Defendants' Motion with record evidence, Peck cites sparingly to the record, instead relying on allegations made in his Complaint. (See generally Doc. No. 33); Berckeley Inv. Grp., Ltd., 455 F.3d at 201 ("summary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument."). In sum, Peck has not made out any genuine dispute of material fact, and Defendants are entitled to summary judgment on both claims.

Accordingly, I will grant summary judgment.

\* \* \*

**AND NOW**, this 31st day of May, 2024, upon consideration of Defendants' Motion for Summary Judgment (Doc. No. 29), Plaintiff's Response in Opposition (Doc. No. 33), and Defendants' Reply Memorandum (Doc. No. 37), it is hereby **ORDERED** that Defendants' Motion is **GRANTED**. Judgment is entered in favor of Defendants. The Clerk of Court **SHALL** close this case.

                                                   **AND IT IS SO ORDERED.**

                                                   */s/ Paul S. Diamond*
                                                   Paul S. Diamond, J.